UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

Case No.: 3:17-cv-73-J-39PDB

DUSTY RAY SPENCER,

    Plaintiff,

vs.

FLORIDA DEPARTMENT OF
CORRECTIONS, et al.,

    Defendants.
_____/

## SECOND AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

### Preliminary Statement

COMES NOW the Plaintiff, Dusty Ray Spencer ("Plaintiff"), by and through his undersigned counsel, and by way of this First Amended Complaint against the Defendants, jointly and severally, in both their individual and official capacities, each demonstrated a deliberate indifference by refusing to provide adequate medical treatment, care, and custody to Plaintiff and knowingly disregarded the identifiable and known risk that the failure to provide such medical treatment would ultimately lead to severe physical injury to Plaintiff. These deliberate actions and omissions subjected Plaintiff Spencer to great physical injury, pain, and suffering in violation of his rights as guaranteed by the Eighth Amendment to the United States Constitution.

### Introduction

Plaintiff was diagnosed with Hepatitis C in 2009 while an inmate in the Florida Department of Corrections ("DOC"), and shortly thereafter he began formally requesting

1

that he be given treatment for that disease, but those requests were not granted. In July 2012, Plaintiff was seen by Dr. Montaya in RMC oncology clinic. Dr. Montaya noted that that Plaintiff had a mildly enlarged spleen, bilary sludge, a normal liver, and recommended treatment for his Hepatitis C. In October 2013, a biopsy revealed that the Hepatitis C had advanced to cause stage 4 cirrhosis to Plaintiff's liver.

In January 2014, Dr. Shah with Corizon saw Plaintiff in the gastrointestinal clinic and noted that Plaintiff was at high risk of liver failure. At least as early as March 2014, Dr. Shah recommended that Plaintiff go ahead and start treatment for the Hepatitis C, and that recommendation and chart were forwarded to Plaintiff's primary care physician Dr. Shubert. However, treatment never was commenced. Plaintiff filed multiple grievances, inmate requests, and sick calls, all to no avail. His appeal to DOC in Tallahassee was handled by placing him on a waiting list for treatment in May 2015, after Plaintiff had been told by DOC since at least 2014 that he was already on that list. In February 2016, Dr. James Miller saw Plaintiff and reviewed his file. Dr. Miller noted that Plaintiff's gastrointestinal doctor, Dr. Shah, had recommended Hepatitis C treatment in March 2014 and sent that recommendation to Plaintiff's primary care physician; "however, there is no indication that there was any attempt made to follow on the chart." Dr. Miller wrote in his own chart: "Move forward per G.I. recommendation." No such forward movement has occurred to this day, as Plaintiff continues stuck on the waiting list for the treatment that DOC medical care providers have since March 2014 acknowledged is medically necessary, and for which there is a 90-95% chance of curing the Hepatitis C virus from his body. All the while that virus continues to destroy his health and will likely ultimately take his life, if he does not receive treatment.

## Jurisdiction and Venue

1. Jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1331 in that this is a civil action arising under the Constitution of the United States.

2. Jurisdiction of the Court is invoked pursuant to 28 U.S.C. § 1343(a)(3) in that this action seeks to redress the deprivation, under color of state law, of rights secured to the Plaintiffs by the Constitution and laws of the United States.

3. Plaintiff's claims for relief is predicated, in part, upon 42 U.S.C. § 1983, which authorizes actions to redress the deprivation, under color of state law, of rights, privileges, and immunities secured by the Constitution and laws of the United States, and upon 42 U.S.C. § 1988, which authorizes the award of attorneys' fees and costs to prevailing plaintiffs in actions brought pursuant to 42 U.S.C. § 1983.

4. Venue is proper in this judicial district pursuant to 28 U.S.C. 1391(b) and (c).

## Parties

5. Plaintiff Spencer is incarcerated in the DOC system, and was at all relevant times. He suffers from Hepatitis C but has not been treated for it.

6. Plaintiff has exhausted all available administrative remedies.

7. Defendant Florida Department of Corrections ("DOC") is a governmental agency of the State of Florida, which at all times relevant herein operated the Union Correctional Institution ("UCI") located in Raiford, Florida.

8. Corizon Health ("Corizon") is a private company that contracted with DOC to provide medical care and treatment for the inmates at UCI from a period extending from September 2013 to May 2016.

9. Centurion of Florida, LLC ("Centurion") is a private company that contracted with DOC to provide medical care and treatment for the inmates at UCI from a period extending from May 2016 to the present.

10. Defendant G. Shah, M.D., was a medical doctor employed by DOC and/or Corizon and was responsible for Plaintiff's care during a relevant period of time cited in this Complaint.

11. Defendant Shubert, M.D., was a medical doctor employed by DOC and/or Corizon and was responsible for Plaintiff's care during a relevant period of time cited in this Complaint.

12. Defendant Melendez, M.D., was a medical doctor employed by DOC and/or Corizon and was responsible for Plaintiff's care during a relevant period of time cited in this Complaint.

13. Defendant Haddad, M.D., was a medical doctor employed by DOC and/or Corizon and was responsible for Plaintiff's care during a relevant period of time cited in this Complaint.

**General Factual Allegations**

Hepatitis C and Its Symptoms

14. Hepatitis C is a blood-borne disease caused by the hepatitis C virus ("HCV"). The virus causes inflammation that damages liver cells, and is a leading cause of liver disease and liver transplants.

15. HCV can be either acute or chronic. In people with *acute* HCV, the virus will spontaneously clear itself from the blood stream within six months of exposure. *Chronic* HCV, on the other hand, is defined as having a detectable HCV viral level in the

blood at some point six months after exposure.  Fifty-five to eighty-five percent of infected people will develop chronic HCV.

16. Liver inflammation caused by chronic HCV can significantly impair liver function and damage its crucial role in digesting nutrients, filtering toxins from the blood, fighting infection, and conducting other metabolic processes in the body. Liver inflammation can also cause fatigue, weakness, muscle wasting, skin rashes, and arthritis.

17. People with chronic HCV develop *fibrosis* of the liver, a process by which healthy liver tissue is replaced with scarring.  Scar tissue cannot perform the job of normal liver cells, so fibrosis reduces liver function and results in the same symptoms mentioned above, but with greater intensity.  Fibrosis can also lead to hepatocellular carcinoma (liver cancer).

18. When scar tissue begins to take over most of the liver, this extensive fibrosis is termed *cirrhosis*. Of those with chronic HCV, the majority will develop chronic liver disease and approximately 20% will develop cirrhosis in a 20-year timeframe.

19. Cirrhosis causes additional painful complications, including widespread itching, kidney disease, jaundice, fluid retention with edema, internal bleeding, varices (enlarged veins that develop in the esophagus or intestines, which can burst), easy bruising, ascites (fluid accumulation in the legs and abdomen), encephalopathy (mental confusion and disorientation), lymph disorders, increased risk of infection, seizures, and extreme fatigue. Most of these complications can occur before cirrhosis. If they go untreated, some can cause death, often from infection, bleeding, and fluid accumulation.

20. Abdominal ascites can require paracentesis, a procedure wherein a needle

is inserted into the abdomen to drain the fluid. Without this periodic procedure, the fluid accumulation can decrease the available space for the patient's lungs, thus causing shortness of breath and difficulty breathing.

21. Moreover, once an HCV patient's liver has cirrhosis, it may not be reversible. Some patients with cirrhosis may have too much scar tissue in the liver, even if the liver can heal to some degree once the virus is eliminated by treatment. If scar tissue persists, the patient may still experience the complications of cirrhosis, including liver cancer.

22. Cirrhosis that is accompanied by serious complications is known as *decompensated* cirrhosis. Cirrhosis without serious complications is called *compensated* cirrhosis.

23. Thus, HCV is a physiological disorder or condition that affects one or more body systems, including but not limited to the digestive, gastrointestinal, immune, circulatory, cardiovascular, and hemic systems, and is therefore a physical impairment. This physical impairment substantially limits one or more major life activity, including but not limited to eating, walking, bending, lifting, concentrating, thinking, and communicating; the operation of major bodily functions such as digestive, gastrointestinal, immune, circulatory, cardiovascular, and hemic systems; and the operation of the liver.

24. The DOC regards all prisoners with HCV as having a physical impairment that substantially limits one or more major life activity.

25. HCV is a serious medical need.

Standard of Care for HCV

26. For many years, there were no universally safe and effective treatments for HCV. The standard treatment prior to 2011, which included the use of interferon and ribavirin medications, sometime required injections, had long treatment duration (up to 48 weeks), failed to cure most patients, and was associated with numerous side effects, including psychiatric and autoimmune disorders, flulike symptoms, gastrointestinal distress, skin rashes, and severe anemia. Moreover, not all drug regimens worked for all types of HCV, and many could not be given to patients with other comorbid diseases.

27. In 2011, however, the Food and Drug Administration (FDA) began approving new oral medications, called direct-acting antiviral (DAA) drugs, which have proven to work more quickly, cause fewer side effects, and treat chronic HCV much more effectively. At first, they were designed to work in tandem with the old treatment regimen. But beginning in 2013, the FDA began to approve DAA drugs that can be taken alone.

28. Most importantly, 90 to 95% of HCV patients treated with any of these DAA drugs are cured, whereas the old treatment regime only helped roughly one third of patients.

29. For HCV, a "cure" is defined as a sustained virologic response (SVR)—i.e., no detectable HCV genetic material in the patient's blood—for three months following the end of treatment.

30. In response to the revolutionary DAA medications, the American Association for the Study of Liver Diseases (AASLD) and the Infectious Disease Society of America (IDSA) formed a panel of experts to conduct an extensive, evidence-based

review of the testing, management, and treatment of HCV. The results of that review have been published in a comprehensive document called the HCV Guidance, which is updated regularly and is available at www.hcvguidelines.org. The Centers for Disease Control and Prevention (CDC) encourages health care professionals to follow the evidence-based standard of care developed by the IDSA/AASLD.

31. The IDSA/AASLD guidelines set forth the medical standard of care for the treatment of HCV, which is now well established in the medical community.

32. The IDSA/AALSD panel, through the HCV Guidance, recommends immediate treatment with DAA drugs for all persons with chronic HCV. This is the standard of care for the treatment of HCV, and it reflects the continuing medical research showing the safety, tolerability, efficacy, and dramatic benefits of the DAA drugs.

33. The Florida Department of Children and Families (DCF), the agency responsible for administering the Medicaid program in Florida, recently confirmed that, in determining what is medically necessary and therefore covered by the Medicaid program, DAA medications for HCV should be approved for all adult patients with an HCV diagnosis. DCF also specifically eliminated any requirement that there be any evidence of hepatic fibrosis before covering treatment. Thus, DCF has recognized that the standard of care for HCV is to provide immediate treatment with DAA drugs to all patients with HCV, regardless of the stage of the disease.

34. Under this standard of care, treatment with DAA drugs is expected to cure nearly all infected persons.

35. The benefits of immediate treatment include immediate decrease in liver inflammation, reduction in the rate of progression of liver fibrosis, reduction in the

likelihood of the manifestations of cirrhosis and associated complications, a 70% reduction in the risk of liver cancer, a 90% reduction in the risk of liver-related mortality, and a dramatic improvement in quality of life.

36. Treatment must be provided timely to ensure efficacy. Delay in treatment increases the risk that the treatment will be ineffective.

DOC, Corizon, and Centurion's Unlawful Policy and Practice of Denying Treatment for HCV

37. Despite the clear agreement in the medical community that all persons with chronic HCV should be treated with DAA drugs, the DOC does not provide these lifesaving medications to DOC prisoners with HCV. Instead, DOC and its subcontracting medical care providers have a policy, custom, and practice of not providing DAA medications to prisoners with HCV, in contravention of the prevailing standard of care and in deliberate indifference to the serious medical needs of prisoners with HCV.

38. This policy, practice, and custom has caused, and continues to cause, the unnecessary and wanton infliction of pain and an unreasonable risk of serious damage to the health of DOC prisoners with HCV.

39. Although DOC has a policy governing the treatment of prisoners with HCV, which is outlined in Supplement #3 to Health Service Bulletin (HSB) 15.03.09 and was promulgated on June 27, 2016, in practice almost no prisoners receive DAA medications. Instead, DOC simply enters the names of prisoners with known HCV infection into a database and enrolls them in a gastrointestinal clinic—which means blood draws are taken every six to twelve months—but DOC rarely provides treatment to any inmates.

9

40. The DOC also unjustifiably delays providing HCV treatment, even though the standard of care requires treatment as early as possible. If DAA treatment is delayed until a patient has advanced fibrosis or cirrhosis (generally, the first two DOC priority levels), these medications can be significantly less effective. Moreover, if DAA treatment is delayed until a patient develops decompensated cirrhosis (generally, the first DOC priority level), a liver transplant preceded or followed by DAA treatment is the only way to cure the patient.

41. In practice, the DOC delays treatment for virtually all patients with HCV, regardless of their disease progression, until the patient is released from prison or dies.

42. Moreover, DOC's policy does not address liver transplantation, the only possible cure for people with decompensated cirrhosis. Even if given DAA treatment, many of these patients will likely die without liver transplants.

43. The DOC has enforced the above-described policies, practices, and customs despite knowing that the failure to provide DAA medications to prisoners with HCV subjects those prisoners to an unreasonable risk of pain, liver failure, cancer, permanent damage to their health, and even death. DOC has acted with deliberate indifference to the serious medical needs of DOC prisoners with chronic HCV.

44. DOC will continue its course of conduct unless enjoined by this Court. Plaintiff has no adequate remedy at law to secure the treatment medically necessary.

Allegations Regarding Plaintiff

45. Plaintiff has been incarcerated in the DOC system since 1993. He is 65 years old. He has chronic HCV, type 1a, and stage four cirrhosis.

46. Since July 1993, Mr. Spencer has been at Union Correctional Institution in Raiford, Florida.

47. On or about April 14, 2009, Mr. Spencer tested positive for Hepatitis C, per testing overseen by Dr. A. Nazarene, M.D.

48. On or about September 17, 2009, Mr. Spencer filed his first Inmate Request ("IR"), requesting treatment for his Hepatitis C.

49. On or about May 31, 2010, Plaintiff filed a second IR requesting treatment for Hep C, specifically requesting peglated interferon plus ribavirin. DOC's response, dated June 16, 2017, stated that the physician in the chronic illness clinic will monitor his case.

50. On or about July 26, 2012, Plaintiff was seen by Dr. Montaya in RMC oncology clinic. Dr. Montaya noted that that Plaintiff had a mildly enlarged spleen, bilary sludge, a normal liver, and recommended treatment for his Hepatitis C.

51. On or about November 8, 2012, Plaintiff filed an IR requesting that a liver biopsy be conducted, reporting that his doctor told him that he must have a liver biopsy prior to treatment beginning for his Hepatitis C.

52. Around September 2013, Corizon began providing medical care for all inmates at UCI.

53. On or about October 18, 2013, Dr. Shah with Corizon had a liver biopsy conducted on the Plaintiff. Dr. Shah's notes confirm reveal that Plaintiff's Hepatitis C had resulted in stage four cirrhosis of his liver. Further notes made regarding the biopsy reveal liver parenchyma with mild to moderate portal necroinflammatory activity, grade

1-2, as caused by Hepatitis C.

54. On or about December 18, 2013, Dr. J. Aviles with Corizon noted that Plaintiff had poor blood circulation and edema in his legs as a result of his Hepatitis C.

55. On or about January 4, 2014, Dr. Shah saw Plaintiff in the gastrointestinal clinic and noted that Plaintiff was at high risk of liver failure. Dr. Shah recommended a pre-dialysis diet, that Plaintiff's intake of prednisone be tapered off until the decision to treat him was made, and suggested that he may need the support of a liver transplant center.

56. On or about January 17, 2014, Plaintiff was admitted to Memorial Hospital in Jacksonville for blood clotting in his left leg, and he was discharged on or about January 20.

57. On or about March 12, 2014, after Plaintiff's gastrointestinal appointment, Dr. Shah recommended starting Hepatitis C treatment, per Corizon protocol and residential treatment. Dr. Shah forwarded Plaintiff's chart to Plaintiff's primary care physician Dr. Shubert.

58. On or about May 19, 2014, Plaintiff filed an IR requesting that he be treated with Soraldi, given that DOC several days prior refused his request to be treated with Interferon. DOC's response, dated May 29, 2014, stated that Plaintiff's clinic and lab work are reviewed by a committee that follows national guidelines for Hepatitis C treatment. This response was signed by R. Dewoody, RN, Corizon.

59. On or about November 5, 2014, Plaintiff filed another IR requesting Soraldi. DOC's response, dated November 15, 2014, stated that Plaintiff should discuss

his request with his physician at his appointment later that month. This response was signed by W. Downs, LPN, Corizon.

60. On or about March 2, 2015, Plaintiff sent a Request for Administrative Remedy or Appeal to UCI Warden for negligible medical treatment for his Hepatitis C.

61. On or about March 20, 2015, Plaintiff sent a Request for Administrative Remedy or Appeal to Secretary for DOC in Tallahassee.

62. On or about May 13, 2015, DOC responded to Plaintiff's appeal for grievance and by placing him on a waiting list for treatment. This response was signed by D. Soud, representative for Secretary for DOC.

63. On or about January 6, 2016, Plaintiff filed an IR inquiring as to when his treatment for Hep C would begin. DOC's response, dated January 14, 2016, stated that Plaintiff should discuss with his GC and that no notes from his gastrointestinal doctor indicate that he should receive treatment. This response was signed by K Crawford, Medical Assistant, Corizon.

64. On or about February 1, 2016, Plaintiff submitted a sick call request for "treatment for the Hep C Virus that has been eating away at my liver since 2009." He continued, "To continue to put me 'on hold' is a 'deliberate indifference' to my medical needs." DOC's response was that Plaintiff should discuss his condition with the doctor at his next gastrointestinal appointment. This response was signed by D. Cordeau, RN, Corizon.

65. On or about February 16, 2016, Dr. James Miller had an appointment with Plaintiff. Dr. Miller noted that Dr. Shah recommended Hepatitis C treatment in

March 2014. Dr. Miller observed, "It is indicated on the consult sheet that the primary care MD at that time reviewed and signed off on the consult; however, there is no indication that there was any attempt made to follow on the chart." Dr. Miller instructed: "Move forward per G.I. recommendation."

66. In May 2016, Centurion took over providing medical care to prisoners at UCI from Corizon.

67. On June 27, 2016, DOC promulgated Supplement #3 to Health Service Bulletin (HSB) 15.03.09 relating to its treatment policy for inmates with Hepatitis C.

68. On September 6, 2016, Dr. Haddad saw Plaintiff in the gastrointestinal clinic and noted that he was high priority for Hepatitis C treatment.

69. Plaintiff still to this day has received no treatment attempting to eliminate the Hepatitis C virus from his body, despite the existence of highly effective antiviral drugs that multiple medical care providers, acting under color of law, have recognized as medically needed for Plaintiff.

70. Plaintiff has not been placed on a liver transplant waiting list.

## CAUSE OF ACTION

### COUNT 1

**Eighth Amendment to the U.S. Constitution via 42 U.S.C. § 1983**

71. Plaintiff realleges and incorporates by reference the allegations set forth in paragraphs 1 through 71 of this First Amended Complaint as if fully set forth herein.

72. The actions of the Defendants, as stated herein, indicate a deliberate indifference to the serious medical needs of Plaintiff.

73. The Defendants, with knowledge of Plaintiff's serious medical needs and with deliberate indifference to such serious medical needs, acted or failed to act in such manner as to prevent Plaintiff from obtaining needed medical treatment and care and/or to prevent needed medical treatment and care from reaching the Plaintiff.

74. The actions and/or omissions of the Defendants, in being deliberately indifferent to the serious medical needs of Plaintiff, are a direct and proximate cause of damage to Plaintiff's health and well-being.

75. The actions and/or omissions of the Defendants are indicative of a policy or custom in place within Corizon, Centurion, and DOC that is a direct and proximate cause of damage to Plaintiff's health and well-being.

76. The acts and omissions of all the Defendants in this case deprived Plaintiff of his clearly established rights under the Eighth and Fourteenth Amendments to the United States Constitution in violation of 42 U.S.C. § 1983.

77. Defendants actions and omissions were willful, wanton, reckless, intentional, conscious and malicious and in deliberate disregard of Plaintiffs'

Constitutional rights.

78. As a proximate result of the acts, omissions and Constitutional violations by Defendants as alleged above, Plaintiff has suffered, and continues to suffer, physical injury and pain, mental anguish, fear, emotional distress, bodily injury, loss of earning capacity, and loss of enjoyment of life.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands the following relief:

1. Enter judgment on behalf of Plaintiff against all Defendants on Count 1 herein;

2. Award Plaintiff compensatory damages against Defendants in amounts to be determined by the jury;

3. Award Plaintiff punitive damages against Defendants in their individual capacity;

4. Award Plaintiff reasonable attorneys' fees, court costs, expenses, pre-judgment interest, and post-judgment interest;

5. Issue a preliminary and permanent injunction ordering Defendant to, among other things, 1) immediately provide direct-acting antiviral medications to Plaintiff, and 2) immediately place Plaintiff on a liver transplant list,

6. Enter an order retaining jurisdiction over this matter to ensure that the terms of any injunction are fully implemented; and

7. Order such other relief as the Court may deem equitable and just under the circumstances.

Dated this 19th day of March, 2018.

Respectfully submitted,

/s/ Joseph Hamrick
**JOSEPH HAMRICK, ESQ.**
Fla. Bar No. 47049
301 W. Bay St. Suite 14117
Jacksonville, FL 32202
904-310-7494
joseph.s.hamrick@gmail.com
Attorney for Mr. Spencer

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 19th day of March, 2018, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF System, and will send a copy of the foregoing electronically to the following:

THE TOOMEY LAW FIRM LLC
*Attorneys for Defendants Corizon, Melendez and Shah*
The Old Robb & Stucky Building 1625 Hendry Street, Suite 203 Fort Myers, FL 33901
Phone: 239.337.1630
Fax: 239-337.0307
Email: gat@thetoomeylawfirm.com, alr@thetoomeylawfirm.com, and hms@thetoomeylawfirm.com

Ana Francolin Dolney
*Attorneys for Centurion of Florida, LLC*
Cruser, Mitchell, Novitz, Sanchez, Gaston & Zimet, LLP
121 S. Orange Ave., Suite 1500 Orlando, FL 32801
Phone: 407-730-3535
Fax: 407-730-3540
Email: afrncolin@cmlawfirm.com flcourtfilings@cmlawfirm.com

Damaris Reynolds
*Attorneys for Florida Department of Corrections*
Office of the Attorney General PL-01 The Capitol
400 S. Monroe St.
Tallahassee, FL 32399
Phone: 850-414-3663
Fax: 850-488-4872
Email: Damaris.Reynolds@myfloridalegal.com

                                          /s/ Joseph Hamrick
                                          **JOSEPH HAMRICK, ESQ.**